IN THE UNITED STATES DISTRICT COURT FOR
THE DISTRICT OF MARYLAND, NORTHERN DIVISION

|  |  |  |
|---|---|---|
| STEPHEN B. EIGLES, | * | |
| Plaintiff –<br>Counter-Defendant, | * | |
| v. | * | CIVIL NO.: WDQ-07-2223 |
| JONG K. KIM, *et al.*, | * | |
| Defendants –<br>Counter-Plaintiffs. | * | |

\*    \*    \*    \*    \*    \*    \*    \*    \*    \*    \*    \*    \*

MEMORANDUM OPINION

Stephen B. Eigles, MD, sued Jong K. Kim, MD ("J. Kim"),

Myung-Sup Kim, MD ("M.S. Kim") (collectively, the "Kims"), and

others[1] for breach of contract, fraud, and related claims arising

out of a radiology business. The Kim Parties counterclaimed for

breach of contract and tortious interference with prospective

economic advantage. For the following reasons, the Kim Parties'

motion for partial summary judgment will be granted in part and

denied in part, and Eigles's cross-motion for partial summary

---

[1] J. Kim Radiology Associates, PA d/b/a Pro Radiology, PA ("Pro
Radiology"); Myung-Sup Kim, MD, PA ("M.S. Kim, PA"); ADR, LLC
d/b/a Advanced Diagnostic Radiology ("ADR"); and U.S. Mobile
Imaging, LLC ("U.S. Mobile") (collectively, the "Kim Parties").
3d Am. Compl. ¶ 1. Eigles also sued Frank G. Gerwig; Frank G.
Gerwig & Associates, PA ("FGA"); and Tri-State Management ("Tri-
State") (collectively, the "Gerwig Defendants"). *Id.*

judgment and the Gerwig Defendants' motion for summary judgment will be denied.

I.   Background[2]

In 2003, radiologists J. and M.S. Kim established ADR to provide radiology services in Cumberland, Maryland. ECF No. 144 at 12; J. Kim Dep. 47:14-48:9, Jan. 8, 2010. The Kims also maintained affiliated Maryland businesses: Pro Radiology; M.S. Kim, PA; and U.S. Mobile. 3d Am. Compl. ¶¶ 7-8, 10; Gerwig Dep. 13:12-24, Dec. 15, 2009.[3] It appears that the Kims' businesses entered into contracts with local hospitals, under which the Kims provided radiology services to patients. *See* Countercl. ¶ 28.

Gerwig, an accountant, and FGA, his accounting firm, provided bookkeeping and accounting services to the Kims and their businesses. *Id.* at 13:10-22; Gerwig Dep. 7:15-18, 10:3-4, Nov. 3, 2008. Tri-State, a billing and collection company owned by Gerwig, billed the hospitals that contracted with the Kims. *See id.* at 8:3-9:10. All payments were transmitted solely to Tri-

---

[2] In reviewing a motion for summary judgment, the non-movant's evidence "is to be believed, and all justifiable inferences are to be drawn in [his] favor." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986). In reviewing cross motions for summary judgment, the Court "consider[s] and rule[s] upon each party's motion separately and determine[s] whether summary judgment is appropriate to each." *Monumental Paving & Excavating, Inc. v. Pa. Mfrs.' Ass'n Ins. Co.*, 176 F.3d 794, 797 (4th Cir. 1999).

[3] J. Kim also maintained Summit Radiology Associates, PA ("Summit Radiology") and Western Maryland PET Imaging, LLC ("Western Maryland PET"). ECF No. 142, Ex. 11 at 2; 3d Am. Compl. ¶ 51; ECF No. 176 at 3 n.3.

State.  Eigles Aff. ¶ 3.  FGA and Tri-State commingled business operations, were located on the same premises, and shared many staff members.  *Id.* ¶ 4.  Between 2004 and 2009, the Gerwig Defendants earned 40 to more than 60% of their revenue from the Kim Parties. Gerwig's Supp. Answer to Pl.'s 2d Set of Interrogs. 4.

The Kims invested in ADR by deferring and transferring about $2 million of their ADR compensation directly to the business. *See* M.S. Kim Dep. 77:15-78:22.  ADR was to "repay" the Kims in monthly installments.  *See* J. Kim Dep. 117:11-118:2, Jan. 8, 2010; Gerwig Dep. 92:11-93:12, Dec. 15, 2009.

In October 2003, Eigles, a Maryland radiologist, met with the Kims.  ECF No. 144 at 6; 3d Am. Compl. ¶¶ 18, 22.  They discussed Eigles's working as a radiologist for Pro Radiology. *Id.*  The Kims also told Eigles that they planned to form a partnership, which could include Eigles, that would own and operate ADR and the Kims' other businesses.  *Id.*  Eigles, who is younger than the Kims, "trust[ed] their representations" about partnership opportunities.  *Id.* ¶ 4.

On October 26, 2003, Eigles entered into an agreement with Pro Radiology (the "2003 Employment Agreement"), under which he would become an employee on January 1, 2004.  ECF No. 142, Ex. 9 ¶ 3.  The contract required Eigles to "devote his best efforts . . . and loyalty to rendering professional services."  *Id.* ¶ 2. It also provided that in 2006, Eigles would have the opportunity

3

to become a partner by paying $800,000 over four years. *See id.* ¶ 11.

On January 1, 2004, Eigles began working as a radiologist for Pro Radiology. 3d Am. Compl. ¶¶ 1, 17. The Kims assert that as an employee, Eigles was "unprofessional" and made "significant medical errors," which damaged Pro Radiology's "reputation and ability to obtain and retain radiology business." Countercl. ¶ 33.

In 2005, Eigles and the Kims discussed forming a partnership. *Id.* ¶ 32. On June 10, 2005, they included an addendum to the 2003 Employment Agreement:

> [P]rior to buying into [a partnership,] Eigles will have the right to review all financial documents of Pro Radiology and ADR. . . . He will subsequently have the option, but not obligation, to buy into [a partnership,] and may opt to only become an equal partner in [a partnership]. . . . At the end of the second year of employment, if [Eigles] opts to neither buy into . . . nor join [the partnership] as an equal partner, the [2003 E]mployment [A]greement will continue, but without a fixed term, and [it] may be cancelled by either party[.]

ECF No. 144, Ex. 9.

Sometime after June 2005, Eigles began seriously considering whether to form a partnership with the Kims. *See* 3d Am. Compl. ¶¶ 38–39. J. Kim instructed Eigles to draft a partnership agreement with H. Gregory Skidmore, Esq., the Kims' lawyer, which the Kims would review. J. Kim Dep. 46:6–17, Oct. 21, 2008. Neither J. nor M.S. Kim gave Skidmore input or direction about the

4

format or substance of the agreement. *Id.* at 46:18–48:7; M.S. Kim Dep. 48:8–14.

In late 2005, Skidmore and Eigles began meeting to draft an agreement. Skidmore Dep. 52:7–53:7. At one meeting, Eigles asked something like, "[W]hat do you think about arbitration?" Eigles Dep. 88:10-12, Oct. 17, 2008. Eigles, who was not "well-informed" about arbitration, had "read about it in a book" and "wanted [Skidmore's] opinion." *Id.* at 88:4-7. Skidmore included an arbitration provision in the first draft of an agreement. Skidmore Dep. 180:4-14.

Sometime before November 2005, the Kims asked Gerwig to compute the monthly repayments they would start receiving for the $2 million of compensation they had deferred and transferred to ADR. *See* J. Kim Dep. 117:11-118:2, Jan. 8, 2010; Gerwig Dep. 92:11-93:12, Dec. 15, 2009. Gerwig calculated that ADR would pay J. and M.S. Kim each about $20,000 a month plus interest from November 2005 to November 2010 (the "Kim Repayments"). *Id.* To generate a repayment schedule, Gerwig used software to draft two unsigned $1 million promissory notes. *Id.* at 99:4-13. The notes included repayment schedules, and listed ADR as the borrower and Summit Radiology[4] and M.S. Kim, PA[5] as the lenders. ECF No.

[4] Maintained by J. Kim. 3d Am. Compl. ¶ 51; ECF No. 142 at 8.

[5] Maintained by M.S. Kim. 3d Am. Compl. ¶ 51; ECF No. 142 at 8.

142, Ex. 11 at 2, 5. The notes were never executed. ECF No.
142 at 8; ECF No. 173 at 11.

In November 2005, Gerwig began issuing the Kim Repayment
checks. *See* Gerwig Dep. 129:15-130:2, Dec. 15, 2009. Gerwig
noted these payments in ADR's ledger. *Id.* at 129:15-18. The
Kim Repayments were identified as "professional fees" in ADR's
records, and recorded as income on the Kims' personal tax
returns. *Id.* at 145:13-147:7.

In December 2005, Eigles began conducting "due diligence"
to decide whether to join a partnership with the Kims. 3d Am.
Compl. ¶ 52. On December 2, 2005, Eigles and Xiaomu Li, his
wife, met with Gerwig in Gerwig's office. ECF No. 142 at 9; Li
Dep. 35:9-25. The promissory notes with the repayment schedules
and ADR's ledger noting the November 2005 Kim Repayments were in
the office. Gerwig Dep. 129:19-130:6, Dec. 15, 2009. Gerwig
gave Eigles and Li ADR's balance sheets and income statements
from January 1, 2004 to October 31, 2005. *See* Li Dep. 35:12-25.

At the meeting, Eigles or his wife asked Gerwig if he had
ADR's November 2005 financial records. *See id.* at 36:9-13. Gerwig
said that they were not available. Gerwig Dep. 136:7-11, Dec.
15, 2009; Eigles Dep. 341:15-16, Feb. 19, 2010. Eigles then
asked whether there had been "any significant [or] material
change" to ADR's finances in November 2005. Eigles Dep. 342:14-
24, Dec. 23, 2009; *see also* Eigles Dep. 341:23-342:4, Feb. 19,

6

2010; Li Dep. 88:16-20. Eigles and his wife have testified that Gerwig said "no." Eigles Dep. 342:14-24, Dec. 23, 2009; Eigles Dep. 341:23-342:4, Feb. 19, 2010; Li Dep. 88:16-20. Gerwig does not remember questions about ADR's November 2005 finances. Gerwig Dep. 129:10-14, Dec. 15, 2009.

At the meeting, Gerwig did not tell Eigles or his wife about the Kim Repayments, or identify any document that would have shown them. *Id.* at 130:9-16, 131:4-7. Gerwig failed to disclose this information because "a lot of things [were] going on," and "it just did [not] come up." *Id.* at 131:10-12. Gerwig has testified that Eigles "would [not] have known to bring . . . up [the Kim Repayments]." *Id.* at 131:16-17.

Before and after the December 2, 2005 meeting, Eigles thought that Gerwig "[s]eemed like a nice person," and never felt that he was "overtly mean[,] hostile[,] combative[,] or belligerent." Eigles Dep. 315:23, 320:15-18, Dec. 23, 2009.

On December 22, 2005, Skidmore sent a draft agreement to Eigles and the Kims, which required arbitration of any dispute. ECF No. 176, Ex. 8 at 27-28. Skidmore requested their "desired changes, additions, and/or deletions." *Id.* at 1. Neither J. nor M.S. Kim remembers receiving this document. J. Kim Dep. 50:7-19, Oct. 21, 2008; M.S. Kim Dep. 49:19-50:11.

On December 27, 2005, Eigles reviewed the December 22, 2005 draft and asked Skidmore to make minor changes. ECF No. 176,

7

Ex. 9. The next day, Skidmore sent Eigles and the Kims a revised draft, which contained an arbitration provision and incorporated Eigles's changes. ECF No. 176, Ex. 10 at 26-27. Skidmore asked them to review the document and make comments. *Id.* at 1. The Kims do not remember receiving this document. J. Kim Dep. 50:20-51:7, Oct. 21, 2008; M.S. Kim Dep. 52:16-53:12. Around this time, Eigles paid $250,000 of the required $800,000 buy-in to join a partnership with the Kims. *See* ECF No. 176 at 34.

On January 1, 2006, J. and M.S. Kim and Eigles entered into a partnership (the "Partnership") that owned and operated ADR; Pro Radiology; M.S. Kim, PA; Western Maryland PET; and later U.S. Mobile. ECF No. 120 at 1-2; ECF No. 176 at 1; ECF No. 181 at 4; Gerwig Dep. 228:12-15, Dec. 15, 2009.[6] At some point, the partners made unspecified "oral agreements" under which all the Partnership's "expenses and money got pooled into one [fund] and then . . . was distributed to the three partners." J. Kim Dep. 28:7-12, Oct. 21, 2008. The Partnership's tax returns listed Eigles and the Kims as partners in their personal capacities,

---

[6] The Partnership provided medical services to Maryland and West Virginia. ECF No. 176 at 54 n.7.

As will be discussed, although the parties agree that Eigles and the Kims formed the Partnership on January 1, 2006, they dispute the agreement that governs it. The Kim Parties argue that the Partnership is governed by a draft agreement circulated on April 13, 2006. *See infra* Part II.A.3. Eigles asserts that the Partnership operated under an oral agreement governed by the Maryland Revised Uniform Partnership Act ("RUPA"). Md. Code Ann., Corps. & Ass'ns §§ 9A-101 *et seq.*; *see infra* Part II.B.1.

each receiving 33% of the Partnership's profits. ECF No. 173, Ex. G at 7, 9, 11.

As partner, Eigles was given access to the Kim Parties' financial records, which contained the Kim Repayments. Gerwig Dep. 27:19–29:3, Nov. 3, 2008. Eigles did not review them. Eigles Dep. 336:23–339:9, Dec. 23, 2009.

In January 2006, Eigles hired Herbert McGuire, Esq., to "appropriately structur[e the] Partnership arrangement." McGuire Dep. 9:5–14. Because McGuire is not a Maryland lawyer, Eigles's Maryland counsel was to conduct a "final review" of documents prepared by McGuire. *Id.* at 17:3–22. The Kims allowed Skidmore to work with McGuire to draft a partnership agreement. ECF No. 176, Ex. 15; Skidmore Dep. 90:10–14.

On January 25, 2006, McGuire drafted and circulated a partnership agreement, which included an arbitration clause. ECF No. 176, Ex. 16 at 15; McGuire Dep. 23:10–24. McGuire "always" includes an arbitration clause in his initial contract drafts so that he can later discuss with his clients whether arbitration is appropriate. *Id.* at 25:8–12. However, McGuire considers arbitration suitable for powerful entities only, not individuals. *Id.* at 51:4–14. Because they "never got that far" in their meetings, Eigles and McGuire did not discuss arbitration. *Id.* at 25:13–21.

From January to March or April 2006, more than five drafts of a partnership agreement, all of which contained an arbitration provision, were circulated among and revised by Eigles, Skidmore, and McGuire. *See* ECF No. 176 at 11; McGuire Dep. 27:19-28:20. J. Kim does not remember receiving any drafts. J. Kim Dep. 76:15-77:17, Oct. 21, 2008. M.S. Kim did not entirely review any draft. M.S. Kim Dep. 113:3-11.

On March 8, 2006, Eigles told Skidmore that he wanted to "settle the whole [Partnership] contract at once," and feared that if "partnership arrangements [were left] for later, they [would] never get done[.]" ECF No. 176, Ex. 18.

On April 13, 2006, Skidmore sent another draft partnership agreement (the "2006 Draft Partnership Agreement") to Eigles and the Kims. ECF No. 176, Ex. 21. He noted that "[i]f the draft [a]greement me[t with the partners'] approval, [they would] certainly need to review [it] with . . . Gerwig" for his input "relating to tax issues." *Id.* at 1. Skidmore asked Eigles and the Kims to review the draft and provide "comments[,] changes, additions[,] and/or deletions." *Id.* Eigles avers that he never agreed to the draft. Eigles Decl. ¶ 7. J. Kim never informed Skidmore that he assented to it. *See* J. Kim Dep. 80:6-16, Oct. 21, 2008. M.S. Kim never told Eigles or Skidmore that he agreed to the draft. M.S. Kim Dep. 106:7-12. The document was never signed. *See* ECF No. 176, Ex. 21 at 21.

The 2006 Draft Partnership Agreement identified Eigles, Pro Radiology, and M.S. Kim, PA as partners. *See id.* at 1. The document required arbitration of "any controversy among the [p]artners involving the construction or application of any provision." *Id.* ¶ 15.14. It also contained clauses governing a partner's buy-out. *Id.* ¶ 13.4. A partner who voluntarily left the Partnership was required to give six months' notice, and would be paid the average of the partners' total compensation over the past year. *Id.* ¶ 14.1(a). Failure to give timely notice would reduce the buy-out amount by 10% for each month that the notice was less than required. *Id.* ¶ 14.1(e).

In August 2006, David Isaacs, MD, was employed by Pro Radiology as a radiologist. *See* ECF No. 176 at 37; *id.*, Ex. 18.

By January 2007, ADR had "repaid" the Kims about $470,000. ECF No. 173 at 7. These payments came from ADR's profits, and were made to the Kims before ADR's remaining profits were distributed in equal thirds to the partners. ECF No. 173 at 7; *see* Gerwig Dep. 107:1–108:13, Dec. 15, 2009. Because the Kim Repayments came from ADR's profits, there was less money for the partners' quarterly bonuses. *Id.*

Each quarter, Eigles and the Kims met with Gerwig to review the Partnership's finances. *See* Eigles Dep. 316:20–317:4, Dec. 23, 2009. Eigles's "primary encounters" with Gerwig were at these meetings. *Id.* On January 10, 2007, Gerwig reviewed the Part-

11

nership's 2006 records with the partners. 3d Am. Compl. ¶ 50.
Because the distributions appeared unusually small to Eigles, he
reviewed the Partnership's books. *Id.* ¶ 50. Eigles then discovered
the Kim Repayments noted in ADR's ledger as professional fees.
*Id.* ¶ 51.

On January 12, 2007, Eigles met Gerwig to discuss these
fees. *Id.* ¶ 52. Gerwig showed him the promissory notes listing
the repayment schedules. *Id.* Gerwig explained that although
the notes had not been executed, he had issued monthly payments
to the Kims. *Id.*

Soon after that, Eigles confronted the Kims about withholding
information about the repayments when he was deciding whether to
become partner. Am. Compl. ¶ 57. The Kims asserted that they
had not intended to hide the payments, and agreed to pay Eigles
about $160,000 (one third of the $470,000 Kim Repayments) so
they could focus on their work. 3d Am. Compl. ¶¶ 57-58; M.S.
Kim Dep. 183:18-184:2; ECF No. 142 at 15-16. They also agreed
to stop the repayments "to pacify [Eigles] and try[] to come up
with . . . a resolution." M.S. Kim Dep. 183:1-5. The Kims have
paid Eigles $40,000 without interest. 3d Am. Compl. ¶ 58.

In March 2007, J. Kim instructed Gerwig to withhold the
Partnership's monthly financial statements from Eigles to "alle-
viate the disruption Eigles was causing [about] equalizing all
expenses." Kims' Answer ¶ 61. That month, Eigles, "frustrated"

that the partners had not finalized a written contract, drafted
and circulated a new partnership agreement.  ECF No. 176 at 21;
ECF No. 176, Ex. 28; Eigles Dep. 41:2-14, Oct. 17, 2008.
Eigles's draft included buy-out terms similar to the 2006 Draft
Partnership Agreement, but no penalty for untimely notice of
withdrawal.  ECF No. 176, Ex. 28 at 3.  He also did not include
an arbitration clause.  In April 2007, Eigles circulated a
slightly revised draft agreement.  ECF No. 176 at 21; *id.*, Ex.
29.  J. Kim never saw and M.S. Kim does not remember seeing
either document.  *See* J. Kim Dep. 112:5-16, Oct. 21, 2008; M.S.
Kim Dep. 91:4-92:4.

By April 2007, no partnership agreement had been signed by
Eigles or the Kims.  *See* ECF No. 144 at 2; ECF No. 173 at 4.  J.
and M.S. Kim never discussed arbitration with each other or
Eigles.  *Id.* at 68:19-69:6; J. Kim Dep. 77:18-78:13, Oct. 21,
2008.

In April 2007, Eigles and his family moved to Florida.  *See*
ECF No. 165 at 2.  In an April 13, 2007 letter to the Kims,
Eigles resigned without notice.  ECF No. 144, Ex. 19.  Eigles
stated that he was disappointed with the Kims' accounting and
refusal to sign a partnership agreement, and his "last day as a
partner" would be that day.  *Id.* at 1.  To "allow for continuity
of patient care and appropriate practice staffing," Eigles stated
that he was "willing to continue working at the practice at a

13

per diem rate of $3,500 per day . . . on an as-needed basis at [the Kims' discretion]" until May 2007. *Id.*

The Kims assert that after Eigles resigned, the Partnership was forced to terminate "negotiations of one potentially lucrative radiology contract with a local hospital," and two existing radiology contracts with other hospitals. Countercl. ¶¶ 32, 42, 49. Also after Eigles resigned, Isaacs quit Pro Radiology. *Id.* ¶¶ 47-48. The Kim Parties assert that Eigles "intentionally and willfully played a role" in Isaacs's departure, and the Partnership was forced to "give up an existing hospital practice [and] institute significant cut backs . . . at hospitals it continued to service." *Id.*

In May 2007, Eigles and his wife went to China, where he intended to, or did temporarily, practice teleradiology. *See* ECF No. 165 at 3-4.

On August 21, 2007, Eigles sued the Kims, Pro Radiology, FGA, and Tri-State for breach of contract, fraud, accounting, and related claims. In November 2007, Eigles returned to the United States. *Id.* at 5. In January 2008, he again traveled to China with his wife, where they stayed with family and friends. *Id.* at 6.

On June 12, 2008, Eigles added defendants M.S. Kim, PA, ADR, and U.S. Mobile, and promissory estoppel and civil conspiracy claims. 2d Am. Compl.; ECF No. 33 ¶ 8; ECF No. 38.

14

On August 8, 2009, Eigles returned from China and permanently settled in Florida with his family. ECF No. 165 at 6.

On December 16, 2009, Eigles added Gerwig as the last defendant. 3d Am. Compl. ¶ 12.[7] Sometime after that, the Kim Parties retained David H. Glusman, an accountant, as an expert witness. *See* ECF No. 176, Ex. 39 at 4. Glusman calculated the revenue and expenses of the Partnership's businesses before and after Eigles's resignation. *See* ECF No. 181, Ex. 11 at 3; Glusman Dep. 248:16-22; *infra* Part II.B.2.

On April 27, 2010, the Gerwig Defendants moved for summary judgment. ECF No. 142. On April 30, 2010, the Kim Parties moved for partial summary judgment. ECF No. 144.[8] On February 18, 2011, Eigles opposed the Gerwig Defendants' motion for summary judgment. ECF No. 173. On February 22, 2011, Eigles opposed the Kim Parties' motion for partial summary judgment, and filed a cross-motion for partial summary judgment against them. ECF No. 176. On March 25, 2011, the Gerwig Defendants filed their reply on their motion for summary judgment. ECF No. 179. That day, the Kim Parties opposed Eigles's cross-motion

---

[7] Jurisdiction is based on diversity; Eigles was a Florida citizen when he sued, and all the defendants are Maryland citizens. 3d Am. Compl. ¶¶ 5, 15; *see also* ECF No. 165.

[8] That day, the Kim Parties also moved *in limine* to exclude an expert opinion on Eigles's alleged "lost income" damages. ECF No. 145. As will be discussed in Part II.A.6, this motion will be denied as moot.

for partial summary judgment, and filed their reply on their
motion for partial summary judgment. ECF No. 181. On April 15,
2011, Eigles filed his reply on his cross-motion for partial
summary judgment. ECF No. 184.

II. Analysis

   A. The Kim Parties' Motion for Partial Summary Judgment

      1. Standard of Review

    Under Rule 56(a), summary judgment "shall [be] grant[ed] .
. . if the movant shows that there is no genuine dispute as to
any material fact and the movant is entitled to judgment as a
matter of law." Fed. R. Civ. P. 56(a).[9] In considering the
motion, "the judge's function is not . . . to weigh the evidence
and determine the truth of the matter but to determine whether
there is a genuine issue for trial." *Anderson v. Liberty Lobby,
Inc.*, 477 U.S. 242, 249 (1986). A dispute about a material fact
is genuine "if the evidence is such that a reasonable jury could
return a verdict for the nonmoving party." *Id.* at 248.

    The Court must "view the evidence in the light most favorable
to . . . the nonmovant, and draw all reasonable inferences in
h[is] favor," *Dennis v. Columbia Colleton Med. Ctr., Inc.*, 290

---

[9] Rule 56(a), which "carries forward the summary-judgment stan-
dard expressed in former subdivision (c)," changed "genuine
'issue' [to] genuine 'dispute,'" and restored the word "'shall'
. . . to express the direction to grant summary judgment." Fed.
R. Civ. P. 56 advisory committee's note.

F.3d 639, 645 (4th Cir. 2002), but the Court must abide by the "affirmative obligation of the trial judge to prevent factually unsupported claims and defenses from proceeding to trial," *Bouchat v. Balt. Ravens Football Club, Inc.*, 346 F.3d 514, 526 (4th Cir. 2003) (citation and internal quotation marks omitted).

2. The Kim Parties' Motion

In moving for partial summary judgment, the Kim Parties argue that Eigles's claims are subject to arbitration. ECF No. 144 at 32. They also move for summary judgment on Eigles's promissory estoppel, accounting, and lost income claims. *Id.* at 22-27. Eigles argues that the parties never agreed to arbitrate, and his claims are viable. ECF No. 176 at 41-52.[10]

3. Arbitration

The Kim Parties assert that Eigles's claims are subject to arbitration under the 2006 Draft Partnership Agreement, which was circulated by Skidmore. ECF No. 144 at 32.[11] They assert that the document and previous drafts contained an arbitration clause. *Id.* at 32-33. Eigles argues that the partners never

---

[10] As will be discussed in Part II.B.1, Eigles also asserts that the partners operated under an oral partnership agreement governed by RUPA.

[11] That draft requires arbitration of "any controversy among the [p]artners involving the construction or application of any provision." ECF No. 176, Ex. 1 ¶ 15.14.

17

assented to the 2006 Draft Partnership Agreement. ECF No. 176 at 52.

A court may compel arbitration under the Federal Arbitration Act (the "FAA")[12] if the parties agreed in writing to arbitrate the dispute. *Adkins v. Labor Ready, Inc.*, 303 F.3d 496, 500-01 (4th Cir. 2002). Whether a party agreed to arbitration depends on "state-law principles that govern the formation of contracts." *First Options of Chi., Inc. v. Kaplan*, 514 U.S. 938, 944 (1995).

In Maryland,[13] a contract exists only if the "minds of the parties . . . agree[] as to its terms." *Safeway Stores, Inc. v.*

---

[12] In a diversity case, the FAA applies to transactions involving interstate commerce. *See* 9 U.S.C. § 2; *Am. Home Assur. Co. v. Vecco Concrete Constr. Co.*, 629 F.2d 961, 963 (4th Cir. 1980). Eigles concedes that the Partnership engaged in interstate transactions by providing medical services in Maryland and West Virginia. ECF No. 176 at 54 n.7.

[13] In a diversity case, the choice of law rules are those of the state in which the district court sits. *Klaxon Co. v. Stentor Elec. Mfg. Co.*, 313 U.S. 487, 496-97 (1941). Maryland follows the *lex loci contractus* rule, under which "the law of the jurisdiction where the contract was made controls its validity and construction." *Kramer v. Bally's Park Place, Inc.*, 311 Md. 387, 390, 535 A.2d 466, 467 (1988). For choice-of-law purposes, "a contract is made where the last act necessary to make the contract binding occurs." *Konover Prop. Trust, Inc. v. WHE Assocs., Inc.*, 142 Md. App. 476, 490, 790 A.2d 720, 728 (2002).

The parties agree that Maryland law governs the determination whether the 2006 Draft Partnership Agreement is binding. *See* ECF No. 144 at 34; ECF No. 176 at 56-57. The parties also agree that Maryland law applies to Eigles's promissory estoppel, accounting, lost income, conspiracy, and punitive damages claims, and to whether RUPA governs the Partnership. ECF No. 142 at 29-31; ECF No. 144 at 24, 26, 28; ECF No. 173 at 21-22; ECF No. 176 at 31, 46-47, 49; ECF No. 181 at 21-25.

*Altman*, 296 Md. 486, 489, 463 A.2d 829, 831 (1983). A party's signature or conduct may be sufficient to "manifest acceptance" of a contract. *Porter v. Gen. Boiler Casing Co.*, 284 Md. 402, 410-11, 396 A.2d 1090, 1095 (1979). If terms remains subject to negotiation, there is no contract because there is no meeting of the minds. *Chesapeake Supply & Equip. Co. v. Manitowoc Eng'g Corp.*, 232 Md. 555, 566, 194 A.2d 624, 630 (1963).

Viewed in the light most favorable to Eigles, there is no evidence of a meeting of the minds about the 2006 Draft Partnership Agreement. *See Dennis*, 290 F.3d at 645. That document was never signed. *See Porter*, 284 Md. at 410-11, 396 A.2d at 1095. Also, the parties' conduct did not manifest assent. *See id.* Eigles never agreed with the draft. Eigles Decl. ¶ 7. J. Kim never told Skidmore that he agreed to the draft, and has not argued that he expressed assent to Eigles. *See* J. Kim Dep. 80:6-16, Oct. 21, 2008. Similarly, M.S. Kim never told Skidmore or Eigles that he agreed to the draft. M.S. Kim Dep. 106:7-12. Regarding the arbitration clause, the Kims did not discuss arbitration with each other or Eigles before or after receipt of this draft. J. Kim Dep. 77:18-78:13, Oct. 21, 2008; M.S. Kim Dep. 68:19-69:6.

Further, although the 2006 Draft Partnership Agreement identifies a partnership among Eigles, Pro Radiology, and M.S. Kim, PA, the Partnership's tax returns list Eigles and the Kims

19

as partners in their personal capacities. *See* ECF No. 176, Ex. 21 at 1; ECF No. 173, Ex. G at 7, 9, 11. Thus, a reasonable jury could find that the partners were not operating under this draft.

The record also indicates that there was no meeting of the minds because the 2006 Draft Partnership Agreement remained subject to negotiation and revision. *See Chesapeake*, 232 Md. at 566, 194 A.2d at 630. When Skidmore circulated the document, he asked the partners to provide "comments[,] changes, additions[,] and/or deletions." ECF No. 176, Ex. 1 at 1. He also noted that even if Eigles and the Kims approved the draft, they would "need to review [it] with . . . Gerwig" for his input on tax issues. *Id.*

The Kims suggest that the partners intended to arbitrate disputes because drafts circulated before the 2006 Draft Partnership Agreement included an arbitration clause. ECF No. 144 at 32-33. However, the record shows that Eigles suggested arbitration merely as a possibility,[14] and the Kims were unaware that any draft included arbitration. In his first meeting with Skidmore to draft a partnership agreement, Eigles asked for Skidmore's "th[oughts] about arbitration" because Eigles had

---

[14] Eigles drafted and circulated partnership agreements in March and April 2007 that did not contain an arbitration provision. *See* ECF No. 176, Exs. 28-29.

"read about it" and "wanted [Skidmore's] opinion."[15]  Skidmore

included an arbitration provision in the first draft, but there

is no indication that J. or M.S. Kim directed him to do so.[16]

Also, although the previous drafts included arbitration provi-

sions,[17] the Kims did not review--or remember reviewing--- them.[18]

Further, although McGuire, Eigles's attorney, drafted a

partnership agreement that included an arbitration clause, he

included the clause in his drafts for later discussions with

Eigles.  McGuire Dep. 25:8-12.  Generally, he considers

arbitration inappropriate for individuals, such as Eigles.  *Id.*

at 51:4-14.  Eigles and McGuire never discussed arbitration.

*Id.* at 25:13-21.  Any agreement drafted by McGuire remained

subject to a "final review" by Eigles's Maryland counsel.  *Id.*

at 17:3-22.  Thus, it appears that Eigles and McGuire considered

arbitration a discussion topic--not a contract term.

---

[15] Eigles Dep. 88:10-12, Oct. 17, 2008; *see also id.* at 88:4-7
(Eigles was not "well-informed" about arbitration).

[16] J. Kim Dep. 46:18-48:7, Oct. 21, 2008 (J. Kim gave Skidmore no
substantive instructions about drafting an agreement); M.S. Kim
Dep. 48:8-14 (same as to M.S. Kim).

[17] ECF No. 176, Ex. 8 at 27-28 (Dec. 22, 2005 draft); ECF No. 176,
Ex. 10 at 26-27 (Dec. 28, 2005 draft); McGuire Dep. 27:19-28:20
(more than five drafts with arbitration clauses were circulated
from January to April 2006).

[18] J. Kim Dep. 50:7-51:7, 76:15-77:17, Oct. 21, 2008; M.S. Kim
Dep. 49:19-50:11, 52:16-53:12, 113:3-11.

Accordingly, because a reasonable jury could find that there was no meeting of the minds about the 2006 Draft Partnership Agreement, the Kim Parties' motion for summary judgment to compel arbitration under that document will be denied.

4. Promissory Estoppel

Eigles asserts that the partners operated under an oral agreement governed by RUPA. ECF No. 176 at 4, 30; *see infra* Part II.B.1. Alternatively, Eigles seeks to assert a promissory estoppel claim to "preserve his quasi-contractual rights in the event [that those rights are all] he has." ECF No. 176 at 41.[19] Eigles alleges that the Kims promised him an equal share of the Partnership's profits. 3d Am. Compl. ¶ 78. He asserts that profits were not allocated equally because the Kims were "repaid" nearly $470,000 from ADR before partnership distributions. *See id.* Eigles also alleges that the promise of equal profits was reasonably expected to--and did--induce him to invest time and money in the Partnership. *See id.* ¶¶ 79-80. Eigles asserts that he suffered a detriment by relying on the promise. *Id.* ¶ 81.

In their summary judgment motion, the Kim Parties argue that Eigles's promissory estoppel claim is barred by the 2003

---

[19] As will be discussed in Part II.B.1, a reasonable jury could find that the Partnership was not governed by an oral agreement subject to RUPA.

Employment Agreement, an express contract.  ECF No. 144 at 23–24.  They also assert that Eigles has not established a "clear and definite promise."  *Id.* at 24.

In Maryland, promissory estoppel is an equitable remedy that permits relief when "there is no contract, but . . . circumstances are such that justice warrants a recovery."[20]  Relief is unavailable if an express contract governs the dispute.  *Dashiell*, 358 Md. at 96, 747 A.2d at 607.  As Eigles notes, the 2003 Employment Agreement governs his Pro Radiology employment; it does not include profit distribution or any other terms governing the January 1, 2006 Partnership.  ECF No. 176 at 1, 46; ECF No. 181 at 4.[21]  Thus, Eigles's promissory estoppel claim is not barred by that agreement.  *See Dashiell*, 358 Md. at 94, 747 A.2d at 606.

A promissory estoppel claim must establish: "(1) a clear and definite promise; (2) where the promisor has a reasonable expectation that the offer will induce action or forbearance on the part of the promisee; (3) which does induce actual and

---

[20] *Harte-Hanks Direct Mktg./Balt., Inc. v. Varilease Tech. Fin. Group, Inc.*, 299 F. Supp. 2d 505, 523 (D. Md. 2004) (interpreting Maryland law); *see also Cnty. Comm'rs of Caroline Cnty v. J. Roland Dashiell & Sons, Inc.*, 358 Md. 83, 94, 747 A.2d 600, 606 (2000).

[21] *See* ECF No. 142, Ex. 9 ¶ 3 (2003 Employment Agreement providing that Eigles would become a Pro Radiology employee on January 1, 2004); ECF No. 144, Ex. 9 (2005 addendum providing that if Eigles decided not to join the Partnership, the 2003 Employment Agreement would continue indefinitely).

reasonable action or forbearance[;] and (4) causes a detriment which can only be avoided by the enforcement of the promise." *Pavel Enters., Inc. v. A.S. Johnson Co.*, 342 Md. 143, 166, 674 A.2d 521, 532 (1996).

A clear and definite promise may be established when the circumstances indicate that the parties have finished negotiating the contemplated transaction. *See Dunnaville v. McCormick & Co.*, 21 F. Supp. 2d 527, 534-35 (D. Md. 1998) (interpreting Maryland law). In drawing all reasonable inferences in Eigles's favor, the record indicates that the Kims promised him that the partners would share the profits equally. *See Dennis*, 290 F.3d at 645. J. Kim testified that the partners orally agreed to pool the Partnership's "expenses and money," which would be "distributed to the three partners." J. Kim Dep. 28:7-12, Oct. 21, 2008. Further, the Partnership's tax returns show that each partner received 33% of the profits. ECF No. 173, Ex. G at 7, 9, 11. It would be reasonable to conclude that negotiations about the division of profits were complete when the Partnership was formed because profits were distributed, equally.[22]

---

[22] *See, e.g.*, *Dunnaville*, 21 F. Supp. 2d at 534-35 (rejecting Maryland promissory estoppel claim because the defendant had not made a clear and definite promise to the plaintiff; it was "clear that there was no deal" between the parties to buy commercial property because "many important terms of the transaction" were pending).

Further, a reasonable jury could also find that the promise of a one-third share of the Partnership's profits was expected to and did induce Eigles to pay $250,000 to buy into the Partnership, and work as a partner for more than one year. ECF No. 176 at 34; ECF No. 144, Ex. 19 at 1. Eigles has asserted that he is younger than the Kims, and "trust[ed] their representations" about partnership opportunities. 3d Am. Compl. ¶ 4. Also, a reasonable jury could find that the Kims' unfulfilled promise caused a detriment to Eigles. ADR "repaid" the Kims almost $470,000, and Eigles was to be paid about $160,000 (one third of the repayments). ECF No. 173 at 7. However, the Kims have paid Eigles only $40,000, without interest. 3d Am. Compl. ¶ 58. Thus, Eigles is entitled to the remaining $120,000 only if the promise that the partners were to split profits equally is enforced.

Thus, if the jury finds that neither the 2006 Draft Partnership Agreement nor an oral agreement subject to RUPA governed the Partnership, it could reasonably find that Eigles has established a promissory estoppel claim. The Kim Parties' motion for summary judgment on that claim will be denied.

5. Accounting

Eigles seeks an order that the Kims and the Partnership's businesses produce "all relevant business records" from 2003 onward, and "submit to an accounting." 3d Am. Compl. ¶ 106. He seeks this information so he can, *inter alia*, calculate his

25

liquidation interests based on the true market value and accrued dividends of the Partnership's entities. 3d Am. Compl. ¶ 106. In moving for summary judgment, the Kim Parties assert that Eigles's accounting claim is not cognizable, and moot. ECF No. 144 at 26.

Although an accounting claim "once served a necessary discovery function, that function has been superseded by modern rules of discovery." *Alts. Unlimited, Inc. v. New Balt. City Bd. of Sch. Comm'rs*, 155 Md. App. 415, 507-11, 843 A.2d 252, 306-08 (2004). Thus, in Maryland, a request for accounting is no longer a cause of action.[23] Further, Eigles does not dispute the Kim Parties' assertion that he received all the Partnership's financial information during discovery, including full accounting records from 2003 to 2010. *See* ECF No. 144 at 26-27; ECF No. 181 at 33. Eigles has not identified other records he seeks. Thus, the Kim Parties will be granted summary judgment on Eigles's accounting claim.

---

[23] *See, e.g., Makowski v. Bovis Lend Lease, Inc.*, No. RDB-10-1844, 2011 WL 1045635, at *11 (D. Md. Mar. 17, 2011) (dismissing accounting claim because it was "not cognizable as an independent cause of action" (*citing Alts. Unlimited*, 155 Md. App. 415, 843 A.2d 252)); *IFAST, Ltd. v. Alliance for Telecommc'ns Indus. Solutions, Inc.*, No. CCB-06-2088, 2007 WL 3224582, at *11 (D. Md. Sept. 27, 2007) (same); *Alts. Unlimited*, 155 Md. App. at 507-11, 843 A.2d at 306-08 (lower court properly dismissed accounting claim because it "d[id] not state a cause of action").

6. Lost Income

Eigles asserts that he is entitled to $590,635 in "lost income" from the Partnership. ECF No. 176 at 48; *id.*, Ex. 40 at 17. Maryland allows employees to recover lost income,[24] but has not indicated that a dissociated partner may recover such income *and* his share of the partnership. Thus, the parties appear to agree that whether summary judgment should be granted depends on whether Eigles left the Partnership in April 2007 as a partner only, or as a partner *and* an employee. *See id.*

Eigles argues that he is entitled to his share of the Partnership's value as a dissociated partner, *and* lost income because he was a Pro Radiology "employee who was forced to resign" after discovering the Kims' purported fraudulent conduct. ECF No. 176 at 48. Eigles asserts that he did not find full-time radiology employment until May 2009. *Id.* at 50.[25] In their summary judgment motion, the Kim Parties argue that Eigles stopped being an employee when he joined the Partnership. ECF No. 144 at 27; ECF No. 181 at 35.

---

[24] *See, e.g.*, *Alexander v. Montgomery Cnty.*, 87 Md. App. 275, 281, 589 A.2d 563, 566 (1991) (disabled employees may recover lost wages under worker's compensation laws).

[25] From May to November 2007 and January 2008 to August 2009, Eigles lived in China with family and friends. *See* ECF No. 165 at 3-6.

A partner is distinct from an employee.[26]  Indeed, although Eigles now asserts that he resigned as a partner and an employee, no reasonable jury could find that he was an employee when he left.  In his "letter of resignation from [the P]artnership," Eigles noted that he wanted his "last day as a partner" to be the date of the Kims' receipt.  ECF No. 144, Ex. 19 at 1.  Eigles also stated that he would "continue working at the practice at a per diem rate of $3,500 per day" to ensure patient care and appropriate staffing.  ECF No. 144, Ex. 19 at 1.  As the Kims note, if Eigles were a partner and an employee, it is reasonable to conclude that he need not have made such an offer because he would have remained an employee even after resigning.  ECF No. 181 at 36.

Also, the 2005 addendum to the 2003 Employment Agreement provided that "[a]t the end of the second year of [Pro Radiology] employment, if [Eigles] opts to neither buy into . . . nor join [the Partnership] as an equal partner, the [E]mployment [A]greement will continue, but without a fixed term."  ECF No. 144, Ex. 9.  This addendum indicates that Eigles would no longer be an employee

---

[26] *See, e.g.*, *Reuter v. Reuter*, 102 Md. App. 212, 218–19, 649 A.2d 24, 27 (1994) (noting that after a partner in a law firm sold his partnership interest, he "continued to work for the firm as an employee"); *see also* Md. Code Ann., Corps. & Ass'ns § 9A-101(i) (RUPA's definition of "partnership" is an "association of two or more persons to carry on as *co-owners* [of] a business for profit" (emphasis added)).

after he bought into and joined the Partnership. *See* ECF No. 176 at 1, 34. Thus, the Kim Parties' motion for summary judgment on Eigles's lost income claim will be granted.[27]

Accordingly, the Kim Parties' motion for partial summary judgment is denied on Eigles's promissory estoppel claim and arbitration is not required; it is granted on Eigles's accounting and lost income claims.

B. Eigles's Motion for Partial Summary Judgment[28]

1. Whether RUPA Governs the Partnership

Eigles seeks a judgment that the Partnership was governed by RUPA, and he is entitled to the buy-out valuation,[29] pre-judgment interest, and attorneys' fees under that statute. ECF No. 176 at 30, 33, 35-36. He argues that RUPA necessarily governed the Partnership because, instead of a written contract, the partners

---

[27] Because Eigles has not established a lost income claim, the Kim Parties' motion *in limine* to exclude an expert opinion on Eigles's alleged lost income will be denied as moot. *See* ECF No. 145.

[28] Part II.A.1 discusses the standard of review for a motion for summary judgment.

[29] Under RUPA, a dissociating partner's buy-out price is "the amount that would have been distributable to [that] partner [if] on the date of dissociation, the assets of the partnership were sold at a price equal to the greater of the liquidation value or the value based on a sale of the entire business as a going concern without the dissociated partner and the partnership were wound up as of that date," plus interest. Md. Code Ann., Corps. & Ass'ns § 9A-701(b). Eigles would receive a higher buy-out under RUPA than under the 2006 Draft Partnership Agreement, which imposed a penalty for resigning without notice. *See* ECF No. 176, Ex. 21 ¶ 14.1(e).

operated under an oral contract "that took effect on January 1, 2006"[30] based on "oral agreements made in 2005." ECF No. 176 at 4, 30.

The Kim Parties argue that Eigles has not identified any terms to which the partners orally agreed before January 1, 2006. ECF No. 181 at 22.[31]

In Maryland, a contract--whether written or oral--must be "sufficiently definite" and clear to allow courts to ascertain the parties' "purpose and intention." *Robinson v. Gardiner*, 196 Md. 213, 217, 76 A.2d 354, 356 (1950). Generally, the agreement itself is the primary source for determining what the parties intended. *Shillman v. Hobstetter*, 249 Md. 678, 688, 241 A.2d 570, 576 (1968). If a contract is ambiguous or unclear, extrinsic evidence may be considered to determine the parties' intentions. *Pacific Indem. Co. v. Interstate Fire & Cas. Co.*, 302 Md. 383, 389, 488 A.2d 486, 489 (1985).

Under RUPA:

> [R]elations among the partners and between the partners and the partnership are governed by the partnership agreement. To the extent the partnership agreement does not otherwise provide, [RUPA] governs[.]

---

[30] The parties agree the Partnership was formed that day. ECF No. 176 at 1; ECF No. 181 at 4.

[31] The Kim Parties alternatively argue that the Partnership was governed by the 2006 Draft Partnership Agreement. ECF No. 181 at 25. As discussed in Part II.A.3, however, the record indicates that there was no meeting of the minds about that document.

30

Md. Code Ann., Corps. & Ass'ns § 9A-103(a).

Thus, RUPA is a "gap filler"; "it only governs partnership affairs to the extent not otherwise agreed to by the partners." *Creel v. Lilly*, 354 Md. 77, 90, 729 A.2d 385, 393 (1999).

Although Eigles asserts that the Partnership was governed by an oral agreement reached before January 1, 2006, *see* ECF No. 176 at 4, 30, he has not identified the oral representations the parties made, the terms discussed, or the agreements reached. Although it may be inferred that the partners decided to share profits equally at some time,[32] the Court is unable to determine any other terms to which Eigles and the Kims agreed, and thus cannot determine the "gaps" in the alleged oral agreement to be filled by RUPA. *See Creel*, 354 Md. at 90, 729 A.2d at 393. For example, it is unclear whether the partners agreed to a buy-out valuation; if so, that agreement, not RUPA, would govern. *See id.;* Md. Code Ann. Corps. & Ass'ns § 9A-103(a).

Because the content of the alleged oral Partnership agreement is unclear, the Court may consult extrinsic evidence to determine the parties' intent. *See Pacific*, 302 Md. at 389, 488 A.2d at 489. In viewing the evidence in the light most favorable to the Kim Parties, the partners did not intend that the Partnership's terms be finalized by January 1, 2006. *See Dennis*, 290 F.3d at

---

[32] J. Kim Dep. 28:7-12, Oct. 21, 2008 (the partners orally agreed to distribute the Partnership's "money" among themselves).

645. On January 6, 2006, Eigles hired McGuire to "appropriately structur[e the] Partnership arrangement." McGuire Dep. 9:5-14. A reasonable jury could find that had the partners agreed to terms, Eigles would not have retained McGuire.

Further, between January and March or April 2006, more than five drafts of a partnership agreement were circulated among and revised by Eigles and others. *See* ECF No. 176 at 11; McGuire Dep. 27:19-28:20. On March 8, 2006, Eigles told Skidmore that the terms of the Partnership remained unresolved.[33] In March and April 2007, Eigles circulated draft partnership agreements--both of which contained buy-out provisions. ECF No. 176, Exs. 28-29. Thus, as the Kims note, "there is a genuine [dispute] of fact . . . as to the [P]artnership's agreed terms." ECF No. 181 at 25.

Accordingly, Eigles's motion for summary judgment that the partners operated under an oral agreement governed by RUPA, thus requiring application of that statute's buy-out valuation, pre-judgment interest, and attorneys' fees provisions, will be denied.[34]

---

[33] ECF No. 176, Ex. 18 (Eigles's letter to Skidmore stating that he sought to settle the "partnership arrangements").

[34] It should be noted that an assessment of attorneys' fees under RUPA requires bad faith and arbitrary and vexatious conduct, which Eigles has not pled. Md. Code Ann., Corps. & Ass'ns § 9A-701(i).

2. The Kim Parties' Counterclaims

The Kim Parties have counterclaimed for breach of the 2003 Employment Agreement and the 2006 Draft Partnership Agreement, and tortious interference with prospective economic advantage. Countercl. ¶¶ 30-51.[35] They allege that Eigles's contractual breaches and tortious interference caused a "revenue loss" of at least $1.9 million, and they seek compensatory damages in that amount. *Id.* ¶¶ 32, 35, 42, 45, 49-50.

In his summary judgment motion, Eigles asserts that the Kim Parties "cannot establish damages as a matter of law" because "[e]ach [counterclaim] relies on a legally insufficient measure of damages." ECF No. 176 at 37, 40. Eigles argues that profit loss is the proper damages measure, and the Kim Parties have pled only revenue loss. *Id.* at 37. Eigles also argues that had lost profits been sought, the Kim Parties have failed to

---

[35] The Kim Parties allege that Eigles failed to "devote his best efforts" as a Pro Radiology employee under the 2003 Employment Agreement because he made "significant medical errors" and was "unprofessional," which damaged Pro Radiology's "reputation and ability to obtain and retain radiology business." Countercl. ¶ 33. They also allege that Eigles's "abrupt resignation" violated the 2006 Draft Partnership Agreement, and forced the Partnership to terminate "negotiations of one potentially lucrative radiology contract with a local hospital," and two existing contracts with other local hospitals. *Id.* ¶¶ 32, 41-42, 49. Further, they allege that Eigles "intentionally and willfully played a role" in Isaacs's quitting Pro Radiology, which forced the Partnership to give up an existing hospital practice and significantly cut back radiology services at hospitals it continued to serve. *Id.* ¶¶ 47-48.

establish, with "reasonable certainty," damages on the breach of contract claims. *Id.* at 39-40.

The Kim Parties appear to contend that they seek lost profits. *See* ECF No. 181 at 31. They argue that Glusman, their expert, accounted for lost revenue and expenses, which are relevant to determining lost profits. *Id.* They assert that they should be allowed to "establish a legally sufficient measure of damages at trial." *Id.*

a. Rule 9(g)

Fed. R. Civ. P. 9(g) provides that "[i]f an item of special damage is claimed, it must be specifically stated." "Special damages" are damages that are "unusual for the type of claim in question[, and] are not the natural damages associated with such a claim." *Avitia v. Metro. Club of Chi., Inc.*, 49 F.3d 1219, 1226 (7th Cir. 1995). Lost profits are "normal" in contracts cases, and need not be specially pled. *Id.*

The purpose of Rule 9(g) is to "give notice to the other side" of the damages claimed. *Hollerbach & Andrews Equip. Co. v. S. Concrete Pumping, Inc.*, No. HAR-95-826, 1996 WL 250657, at *1 n.3 (D. Md. Mar. 28, 1996). Rule 9(g) should be "liberal[ly]" construed. *Id.*

Because lost profits are normally associated with contract claims, the Kim Parties need not have "specifically stated" such damages for its breach of contract counterclaims under Rule 9(g).

*See Avitia*, 49 F.3d at 1226. On their tortious interference counterclaim, the Kim Parties have alleged that Eigles was involved in Isaacs's quitting Pro Radiology, which forced the Partnership to significantly reduce radiology services. Countercl. ¶¶ 47-48. It is reasonable to conclude that these reductions would "natural[ly]" result in lost profits, so that damages need not have been specially pled. *Avitia*, 49 F.3d at 1226.

Assuming that Rule 9(g) applies, the complaint indicates that Eigles was on "notice" that the Kim Parties sought damages including profit loss. *See Hollerbach*, 1996 WL 250657, at *1 n.3. Each counterclaim alleges that Eigles damaged the ability of Pro Radiology or the Partnership to maintain contracts and services, resulting in a revenue loss of $1.9 million. *See* Countercl. ¶¶ 32-33, 42, 48; *see also supra* p. 33 n. 35. Thus, it is reasonable to conclude that a claim for lost profits is implied in the allegation of revenue loss.

b. Reasonable Certainty

Eigles also asserts that the Kim Parties have failed to sufficiently establish lost profits on their breach of contract counterclaims. ECF No. 176 at 39-40. To recover lost profits in a Maryland breach of contract claim,[36] the Kim Parties must

---

[36] Maryland law governs the measure of damages because, as the parties agree, the Kim Parties' contract claims are brought

establish lost profits "with 'reasonable certainty,' as distin-
guished from 'certainty.'" *Impala Platinum Ltd. v. Impala Sales
(U.S.A.), Inc.*, 283 Md. 296, 330, 389 A.2d 887, 907 (1987). In
determining whether lost profit damages are reasonably certain, a
jury may rely on "opinion evidence . . . from which liberal
inferences may be drawn." *Id.* at 331, 389 A.2d at 907.

Lost profit damages are calculated by subtracting "costs
avoided as a result of [a] breach" from "revenue lost as a result
of [that] breach." *Hallmark Ins. Adm'rs, Inc. v. Colonial Penn
Life Ins. Co.*, 990 F.2d 984, 989 (7th Cir. 1993). The summary
report and testimony of Glusman, the Kim Parties' expert,
indicates that he has calculated the revenue and expenses of the
Partnership's businesses before and after Eigles's resignation.[37]
Although Glusman's calculations have not been submitted to the
Court, it appears that the Kim Parties intend to present his
computations to a jury,[38] which will be entitled to liberally

---

under Maryland law. *See Walker v. Walker*, Nos. 90-1819, 90-
1829, 1992 WL 57005, at *4 (4th Cir. Apr. 27, 1992); ECF No. 176
at 39; ECF No. 181 at 19-21.

[37] *See, e.g.*, ECF No. 181, Ex. 11 at 3 (summarizing the actual
and projected expenses and revenue loss of the Partnership's
businesses before and after Eigles's departure); Glusman Dep.
248:16-22 (he calculated the "revenue and expenses" of the
Partnership's entities).

[38] *See* ECF No. 181 at 28-29 (explaining that Glusman's calculations
"expressly account" for expenses and lost revenue, to be presented
at trial).

infer that the Kim Parties' lost profits are reasonably certain. *See Impala*, 283 Md. at 331, 389 A.2d at 907. There is no indication that, as a matter of law, the Kim Parties will be unable to sufficiently establish lost profits at trial.

Accordingly, Eigles's motion for summary judgment on the Kim Parties' counterclaims will be denied.

C. The Gerwig Defendants' Motion for Summary Judgment[39]

Eigles alleges that Gerwig and FGA committed fraud by, *inter alia*, withholding material financial information. 3d Am. Compl. ¶ 84. He also asserts that Gerwig, FGA, and Tri-State conspired with the Kim Parties to defraud him. *Id.* ¶ 92. Eigles seeks punitive damages. *Id.* ¶ 96.

In their summary judgment motion, the Gerwig Defendants argue that Eigles has not established fraud, a conspiracy, or the right to punitive damages. ECF No. 142 at 5. They also assert that Tri-State is an improper party because it did not hide information from Eigles. *Id.*

1. Fraudulent Concealment

A Maryland[40] fraudulent concealment claim must establish: (1) the defendant had a duty to disclose a material fact and

---

[39] Part II.A.1 discusses the standard of review for a motion for summary judgment.

[40] Under Maryland choice-of-law rules, "a fraud claim is governed by the law of the place where the injury occurred." *Harte-Hanks*, 299 F. Supp. 2d at 526 n.24 (D. Md. 2004) (*citing Philip Morris,*

failed to do so; (2) the plaintiff "took action in justifiable reliance on the concealment"; and (3) damages.[41]

A duty to disclose a material fact arises when the defendant's "partial or fragmentary" statement misleads the plaintiff because of incompleteness.[42] If the defendant makes a statement, "there is a duty to disclose the additional information necessary to prevent it from misleading the recipient." *Lubore*, 109 Md. App. at 331, 674 A.2d at 556 (*quoting* Restatement (Second) of Torts § 551, cmt. g).

A reasonable jury could find that Gerwig and FGA engaged in fraudulent concealment. Gerwig, acting on behalf of FGA, calculated, scheduled, and issued the monthly ADR repayments that the Kims began receiving in November 2005. *See* J. Kim Dep. 117:11-118:2, Jan. 8, 2010; Gerwig Dep. 92:11-93:12, 99:4-13, Dec. 15, 2009. At the December 2, 2005 meeting with Eigles and

---

*Inc. v. Angeletti*, 358 Md. 689, 752 A.2d 200, 230-31, 233 n.28 (2000)). The parties agree that Eigles has alleged injury in Maryland. *See* ECF No. 142 at 20; ECF No. 173 at 15.

[41] *Lloyd v. Gen. Motors Corp.*, 397 Md. 108, 138, 916 A.2d 257, 274 (2007) (citation and internal quotation marks omitted); *Odyssey Travel Ctr., Inc. v. RO Cruises, Inc.*, 262 F. Supp. 2d 618, 629 (D. Md. 2003) (*citing, inter alia, Finch v. Hughes Aircraft Co.*, 57 Md. App. 190, 232, 469 A.2d 867, 888 (1984)).
    The plaintiff may alternatively establish that the defendant "concealed a material fact for the purpose of defrauding" him. *Id.*

[42] *Odyssey*, 262 F. Supp. 2d at 629 (*citing Lubore v. RPM Assocs., Inc.*, 109 Md. App. 312, 330-31, 674 A.2d 547, 556 (1996); *Walsh v. Edwards*, 233 Md. 552, 557, 197 A.2d 424, 426-27 (1964)).

his wife at Gerwig's office, Gerwig had ADR's ledger noting the November 2005 repayments and the promissory notes with the repayment schedules. *Id.* at 129:19-130:6. Eigles asked Gerwig whether there had been "any significant [or] material change" in ADR's November 2005 financial records. Eigles Dep. 342:14-24, Dec. 23, 2009. Eigles and his wife have testified that Gerwig said no. *Id.* at 342:14-24; Eigles Dep. 341:23-342:4, Feb. 19, 2010; Li Dep. 88:16-20.

Gerwig has testified that he cannot remember any questions about ADR's November 2005 finances; he has not denied that he answered "no." Gerwig Dep. 129:10-14, Dec. 15, 2009. In drawing all reasonable inferences in Eigles's favor, a reasonable jury could find that Gerwig denied material financial change. *See Dennis*, 290 F.3d at 645.

The jury could also find that that statement was "partial or fragmentary" because that month, ADR paid about $40,000 to the Kims. *See* Gerwig Dep. 129:19-130:2, Dec. 15, 2009. Gerwig arguably breached his duty to disclose the Kim Repayments to prevent misleading Eigles about the state of ADR's finances and the Partnership's distributions.[43]

---

[43] *See, e.g.*, *Lubore*, 109 Md. App. at 331, 674 A.2d at 556 (plaintiff stated a fraudulent concealment claim because the defendants had made only a "partial or fragmentary representation" about his employment contract terms, thus failing to fulfill their duty to "tell the whole story").

There is evidence that Eigles acted in justifiable reliance on Gerwig's concealment. *See Lloyd*, 397 Md. at 138, 916 A.2d at 274. Eigles met with Gerwig as part of his "due diligence" before deciding whether to join the Partnership. *See* 3d Am. Compl. ¶ 52. Gerwig knew that Eigles would not have known to "bring . . . up [the Kim Repayments]." Gerwig Dep. 131:16–17, Dec. 15, 2009. A reasonable jury could find that had Gerwig disclosed the Kim Repayments, by which ADR would distribute substantial profits to only two of the three partners, Eigles may not have bought into, joined, and worked for the Partnership for more than one year. *See* ECF No. 176 at 34; ECF No. 144, Ex. 19 at 1.

The record also indicates that Eigles suffered damages from the concealment. *See Lloyd*, 397 Md. at 138, 916 A.2d at 274. When Eigles discovered the Kim Repayments by undertaking a review of the Partnership's records, ADR had paid the Kims nearly $470,000. 3d Am. Compl. ¶¶ 50–51; ECF No. 173 at 7. Although the Kims later agreed to pay Eigles one third of that amount, he has only been paid $40,000, without interest. 3d Am. Compl. ¶ 58. Further, because the Kim Repayments came from ADR's profits, Eigles received lower quarterly bonuses than he would have had there been no payments. *See* Gerwig Dep. 108:10–13, Dec. 15, 2009.

Accordingly, the Gerwig Defendants' motion for summary judgment on Eigles's fraudulent concealment claim will be denied.

2. Conspiracy

In their summary judgment motion, the Gerwig Defendants argue that Eigles has not shown a civil conspiracy among the parties. ECF No. 142 at 29. They also assert that Tri-State is an improper party because Eigles has not established that it concealed any information. *Id.* at 30. Eigles argues that a jury could find that Gerwig, FGA, and Tri-State conspired with the Kim Parties to fraudulently hide information from him. ECF No. 173 at 21.

A Maryland civil conspiracy claim must establish an unlawful agreement between two or more persons, an overt act in furtherance of that agreement, and injury to the plaintiff. *Mackey v. Compass Mktg., Inc.*, 391 Md. 117, 128-29, 892 A.2d 479, 485 (2006). Direct evidence of a conspiracy is "almost never" available. *Daugherty v. Kessler*, 264 Md. 281, 292, 286 A.2d 95, 101 (1972). Thus, a civil conspiracy may be established by circumstantial evidence, which includes "the individual and collective interests of the alleged conspirators." *Id.; Hoffman v. Stamper*, 385 Md. 1, 25-26, 867 A.2d 276, 291 (2005).

Viewing the evidence in the light most favorable to Eigles, a reasonable jury could find that the Kim Parties and Gerwig

41

Defendants agreed to fraudulently conceal information from him. *See Dennis*, 290 F.3d at 645. Each month, the Kims were paid almost $40,000 from ADR's profits before the remaining profits were distributed in equal thirds to the partners.[44] It is reasonable to conclude that Gerwig, FGA, and Tri-State shared a "collective" financial interest in pleasing the Kims, their clients, and concealing the Kim Repayments from Eigles. *Daugherty*, 264 Md. at 292, 286 A.2d at 101. Tri-State, owned by Gerwig, billed hospitals on behalf of ADR and the Partnership's other businesses, and processed all payments. *See* Gerwig Dep. 8:3–9:10, Nov. 3, 2008; Eigles Aff. ¶ 3. Gerwig, on behalf of FGA, issued the Kim Repayments and provided bookkeeping and account-ing for the Kims. *See* J. Kim Dep. 117:11–118:2, Jan. 8, 2010; Gerwig Dep. 13:10–22, 92:11–93:12, 99:4–13, Dec. 15, 2009. Between 2004 and 2009, the Gerwig Defendants earned from 40 to more than 60% of their revenue from the Kim Parties. Gerwig's Supp. Answer to Pl.'s 2d Set of Interrogs. 4.

Further, not only did Tri-State process all of ADR's payments, Gerwig has not denied Eigles's affidavit that FGA and Tri-State commingled business and shared the same location and much of the same staff. Eigles Aff. ¶ 4. Thus, although Eigles has not established that Tri-State concealed information from him, Tri-

---

[44] ECF No. 173 at 7; *see* Gerwig Dep. 92:11–93:12, 107:1–108:13, Dec. 15, 2009; J. Kim Dep. 117:11–118:2, Jan. 8, 2010.

State is a proper party because a reasonable jury could find that it conspired to withhold information about the Kim Repayments.

Also, a reasonable jury could find that Gerwig, on behalf of FGA, committed an overt act in furtherance of the conspiracy to fraudulently conceal information from Eigles. As discussed in Part II.C.1, Eigles and his wife have testified that when Eigles asked whether there had been a material change in ADR's November 2005 finances, Gerwig said "no." Eigles Dep. 342:14-24, Dec. 23, 2009; Eigles Dep. 341:23-342:4, Feb. 19, 2010; Li Dep. 88:16-20. Gerwig concedes that he did not disclose the Kim Repayments or ADR's ledger or the promissory notes revealing them. Gerwig Dep. 130:9-16, 131:4-7, Dec. 15, 2009.

Further, as noted in Part II.C.1, there is evidence that Eigles has been injured because he has been paid only $40,000 of his one-third share of the repayments. 3d Am. Compl. ¶ 58.

Accordingly, Gerwig's motion for summary judgment on Eigles's civil conspiracy claim will be denied.

3. Punitive Damages

The Gerwig Defendants seek summary judgment on Eigles's punitive damages claim. ECF No. 142 at 30; *see* 3d Am. Compl. ¶ 96. They assert that Eigles has not established actual malice or "anything in Gerwig's behavior to suggest that he harbored . . . ill will against [Eigles]." ECF No. 142 at 30-31. Eigles

asserts that his punitive damages claim should be submitted to a jury. ECF No. 173 at 22.

Punitive damages may be awarded only if the defendant's conduct was motivated by "actual malice," which includes fraudulent conduct. *Owens-Illinois, Inc. v. Zenobia*, 325 Md. 420, 460, 601 A.2d 633, 652 (1992).[45] To establish fraud as actual malice, the plaintiff must establish the defendant's "actual knowledge of falsity" and an "intent to deceive . . . by means of [a] false statement." *Ellerin*, 337 Md. at 234, 652 A.2d at 1126. Maryland has "never" considered personal animosity as the "exclusive means" to establish actual malice, especially in a "commercial sphere."[46]

Because actual malice is "seldom admitted and need not be proved by direct evidence," courts must determine whether there is enough circumstantial evidence to "warrant submission of the issue to the jury." *Darcars*, 150 Md. App. at 33, 818 A.2d at 1167 (citation and internal quotation marks omitted).

---

[45] Maryland "has consistently listed fraud among the types of dishonest or immoral conduct for which punitive damages are recoverable." *Ellerin v. Fairfax Sav., F.S.B.*, 337 Md. 216, 228-29, 652 A.2d 1117, 1123 (1995) (citation and internal quotation marks omitted).

[46] *Darcars Motors of Silver Spring, Inc. v. Borzym*, 150 Md. App. 18, 32-33, 818 A.2d 1159, 1167 (2003) (citation and internal quotation marks omitted).

A reasonable jury could find that Gerwig's conduct was motivated by actual malice. There is evidence that Gerwig knew about a material financial change in ADR's finances in November 2005 because: Tri-State[47] processed ADR's payments from hospitals, Gerwig issued the Kim Repayments, and FGA handled the Kim Parties' accounting and bookkeeping. Eigles Aff. ¶ 3; Gerwig Dep. 13:10-22, 129:19-130:2, Dec. 15, 2009. Eigles has testified that Gerwig denied that there had been any material change in ADR's November 2005 finances. Eigles Dep. 342:14-24, Dec. 23, 2009. Thus, a reasonable jury could find that Gerwig "actually kn[ew]" his statement was false because he and his businesses facilitated the Kim Repayments, which came from ADR's profits. *Ellerin*, 337 Md. at 234, 652 A.2d at 1126. A reasonable jury could also find that Gerwig "intend[ed] to deceive" because he knew that Eigles would not have known to "bring up" the Kim Repayments. Gerwig Dep. 131:16-17, Dec. 15, 2009.

Eigles's belief that Gerwig "[s]eemed like a nice person" who was not overtly mean or hostile is not dispositive. Eigles Dep. 315:23, 320:15-18, Dec. 23, 2009. In Eigles and the Gerwig Defendants' commercial relationship, personal animosity is not

---

[47] Owned by Gerwig, and which shared business, premises, and staff with FGA. Gerwig Dep. at 8:3-9:10, Nov. 3, 2008; Eigles Aff. ¶ 4.

required to establish actual malice.[48]

There is sufficient circumstantial evidence to submit the issue of punitive damages to the jury. *See Darcars*, 150 Md. App. at 33, 818 A.2d at 1167. Accordingly, the Gerwig Defendants' motion for summary judgment on Eigles's punitive damages claim will be denied.

III. Conclusion

For the reasons stated above, the Kim Parties' motion for partial summary judgment will be granted in part and denied in part, and Eigles's cross-motion for partial summary judgment and the Gerwig Defendants' motion for summary judgment will be denied.

_____
Date

_____
William D. Quarles, Jr.
United States District Judge

---

[48] *Darcars*, 150 Md. App. at 32-33, 818 A.2d at 1167; Eigles Dep. 316:20-317:4, Dec. 23, 2009 (Eigles's "primary encounters" with Gerwig were at the partners' quarterly meetings about the Part-nership's finances).